Time's running. You may proceed. May it please the Court. Sarah Bradley and Juan Garza under the supervision of Professor Maureen Laughlin, appearing for the appellant Kevin B. Johnson. May I reserve two minutes for rebuttal, Your Honor? Well, there was less than a clock. Thank you. This case is about the state's unauthorized and unreasonable taking of a prisoner's DNA sample without providing the appropriate level of process. Mr. Garza will and I will address the violation of Mr. Johnson's Fourth Amendment rights. The district court erred. Why does it matter? I mean, he eventually had to have his blood taken, and he had to have his skin pricked, blood drawn. He's in the database. All or most of the time that he spent being in the database, he was in prison anyway. It's not like his neighbors are going to discover, oh, you know, I've got a pervert living next door. So what's this all about? I mean, what's the big deal here? The concern is the violation of his Fourth Amendment rights, the fact that the sample was taken before it was lawful for it to be taken. So for five years, his sample was out there when it should not have been. What does out there mean? Well, it was out in the DNA databases. In 99, they took the sample, and then it wasn't... Did he suffer any harm as a consequence of that? Do we have any evidence during those five years there was any hits? That he was implicated in any crimes? I mean, what's the harm? I mean, we don't litigate it with some realities, and I just don't see what the harm is here. We have no evidence that there were any hits from the database. Well, you have the burden to present that. Yes. So, you know, so maybe the DNA was out there. So? I mean, the harm is the violation of the constitutional right, the violation of his Fourth Amendment rights, the fact that they took the sample before they should not have. I mean, even though a prisoner's rights might be diminished in a prison setting, they still have rights. And the fact that this was taken against his protest, and the State recognized the fact that they should not have taken the sample, at least three times in 1999, there were... Your argument is basically that there is a Fourth Amendment violation, and they will be, in response to Judge Kaczynski's questions, that these are nominal damages. And if the case were ever to proceed to trial, that's what the result would be here. You still think it's important to speak out in terms of the violation of the constitutional right, even if there may not be anything more than nominal damages. Is that basically what you're saying? If that's what's proved at a trial, that would be correct. I mean, part of the 1993 action... I guess I'm questioning whether there's any damages at all. I mean, having your DNA out there when there's no hit, there's no implication, nothing happens from it, where's the constitutional violation there? The fact that it was taken – I mean, the seizure of the sample, the unlawful seizure, and the fact that the State recognized in three different... But that eventually had to happen anyway, and did happen. So it was seized at one point, so he had the glove on at one point, but then consequently he saved himself having to have blood drawn five years later. I think it just goes back again to the Fourth Amendment and the fact that they took it before it was lawful. And at the time, the State did not have a legitimate interest in taking that sample. And so looking at the totality of the circumstances... You take the position that any time the State law is violated, it becomes a constitutional violation? No. But State law certainly is relevant in determining reasonableness under the Fourth Amendment, as this Court has held, and the Supreme Court has also recognized that. And so because it's a relevant factor, and the State law here is the justification given for the taking of the sample, therefore the State law is very relevant here, and it does I mean, it can rise to the level of a violation of the Constitution under the Fourth Amendment if that's, you know, looking at the analysis. And so... So what was State law at the time? Can you repeat that? What was State law at the time? State law at the time said that under California Penal Code 296, only felon offenses were required to provide DNA samples. And where is the State law? I mean, when you say the State law says that, what was it? Where is that written? Where is that in the record? How do we determine what State law was? I mean, I don't know where the State law is in the record, but looking at what was codified at the time. What is the incorrect decision of the court of appeal in Ray King? In the King case in 93? Yeah. Well, I don't know. Two Kings. I'm just wanting to make sure. 84? The 84 was the first King case, and in that case, the court held that taking DNA from misdemeanor sex offenders was a violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment. But that case... I mean, that's the basis for the claim, isn't it, that this was not authorized by State law? Actually, that case, though, dealt with California Penal Code 290, which was the registration, not the collection of DNA. So the case law in the State of California at that time had not addressed California Penal Code 296, which governs... So how do we know this was contrary to State law? Because we know what the State law says. We know that the State law says... What does it say? That's what I was asking you. What does State law say? State law says that in 296A2A, it says any felony offense specified in 290 or an attempt to commit any felony offense described in 290 or any felony offense that imposes upon the person the duty to register in California as a sex offender under 290. Every time it's referring to 290, it's talking about felony offenses. And so the law at the time when this was taken said only felony offenses were provided, and that's part of the error that the district court made in granting summary judgment on this issue, because the district court focused only on 290. But it's 296 that's at the heart of the case regarding the Fourth  So if there's an excess of statutory authorization, it's a Fourth Amendment violation. Well, yes. I mean, and at the Federal level, this circuit and the Supreme Court and other circuits looking at DNA collection statutes look at the fact that the people being the samples are being taken from are also the people committing the predicate offense. And so the fact that here we have a State statute in which Mr. Johnson had not committed the predicate offense, that's not something that the Court has held to be constitutional. And the Fourth Amendment would prohibit that. Why isn't it just a violation of State law, for which, you know, you might have a tort claim? It's a violation of Federal law because the law implicates the Federal, I mean, his Federal right of Fourth Amendment protections. I mean, the Fourth Amendment, even though it might be diminished in a privileged setting, it still applies. And so the fact that the State law was misapplied and, you know, he was erroneously taken of his DNA, that doesn't... Yeah, I guess that's the problem I have. I don't know how you take sort of this violation of State law and turn it into a constitutional violation, Federal constitutional violation. So maybe they violated State law. You know, you've got the State courts available, open to tort claims. If he's got a claim, you know, he can pursue it under State law. How does this become a Federal violation? Well, for example, this Court in Rise did look at a State statute and held it constitutional to take DNA from those convicted of the crimes listed in the statute. And so this Court has looked at State laws and determined whether they're constitutional in taking the DNA. And here we have someone... I mean, part of the Court's analysis in Rise was that the Petitioners had committed the predicate offense. But you're saying that the State law is relevant here to a Fourth Amendment claim of unreasonable seizure. The California law essentially almost makes it a per se determination that it's a little pinprick in the finger. That's a matter of... virtually is a matter of certainty. A Fourth Amendment violation triggered off of the statutory violation, but you want to use it as also proof of a Fourth Amendment violation to come under the unreasonableness aspect. Yes, because part of the Fourth Amendment analysis is looking at what society has deemed a legitimate expectation of privacy. And so when we look at that, part of... It's only in the California sense. It's not deemed... all it's done is go so far as to say, at least with respect to felons, we don't think it's unreasonable. Isn't that sort of not answering... that doesn't affirmatively answer the question as to whether they would extend it to others. It's just that they hadn't decided to extend it to others. That isn't a judgment that it would be unreasonable necessarily. It's not, but part of when we look at the reasonableness, part of that looking at is looking at what society deems reasonable. And what the California legislature deemed reasonable at the time was that felon sex offenders had to provide DNA. They clearly made that determination. Did they make it an affirmative determination that they should... is that what you're arguing? There's an affirmative determination that it would have been unreasonable to extend it to misdemeanors as well? Well, you are correct. There is no affirmative determination regarding misdemeanors. But because the law was clear, the law said felonies, as I read earlier, it's not... I mean, extending the law would not be constitutional either. I mean, the fact that the law was there takes away the discretionary right to possibly apply or not apply. The fact is the law clearly said felons under... felons have to provide this. And so the fact that it was being taken from other... you know, it was taken from Mr. Johnson is not constitutional. If there are no more questions, I would like to reserve the rest of my time for my co-counsel, and he'll discuss the 14th Amendment. I bet he's anxious to get up there, too. May it please the Court. My name is Juan Garza. Mr. Johnson's 14th Amendment due process rights were violated by prison officials when they did not provide him with a meaningful opportunity to be heard before depriving him of a liberty interest that was protected by the 14th Amendment. Mr. Johnson has the right to be... What was the liberty interest? The liberty interest was in not... the liberty interest was in not being subjected to the stigma of being labeled as a sex offender, as well as not being subjected to losing his possible probate... to losing his probation date because he didn't submit to the... he didn't submit a sample to the defendants on the date that he submitted the sample. But where in the record does it suggest that this was equivalent to a stigma plus dynamic, which I think is what you have to have here? What loss did he suffer as a result of the so-called stigma? The stigma plus was met in this record... in this case because he was stigmatized... he was labeled as a sex offender. That's the stigma. Excuse me? That's the stigma part, yeah. That's the stigma. The plus in this case was when he was threatened with discipline, which would have subjected him to being... he would have had a CDC 115 form filled out, and that would have made him possibly... But he didn't, right? He did not. No, he did not. No form was filled out. No form was filled out, but defendants do admit that the form would have been filled out if he hadn't submitted his sample. But that's the stigma. Where's the plus? The plus is that he was threatened with losing his parole date if he didn't... But he did, in fact, lose his parole date. No, he didn't. But he submitted. He suffered the stigma. Yes. Where's the plus? The plus is... I'm not going to say that it was... Just being threatened? Excuse me? Just being threatened? It was being coerced into submitting samples that he didn't need to submit. It was the chilling effect that the threat of the punishment had on him. There was... He didn't grieve any of the prison official's actions immediately after the submission of the samples because of the chilling effect this had. His parole date was less than three months away from the time the samples were submitted. He was afraid to say, no, I don't want to... I'm not supposed to be a registrant under this statute. If I protest and if I get this form filled out against me, the CDC-115 form, I'm going to lose my possible parole date. That has a chilling effect on allowing him to go assert his rights, to go assert that he's due notice and at least... I get what you're saying, but I don't understand it. What does the chilling effect have to do with stigma plus? You're saying the plus is, in fact, the foregoing rights? I'm arguing that the plus is not the foregoing... While it does seem like it is the foregoing of the rights, the plus is the possible extension of his prison time. But he didn't have it. It was not extended, so the possibility that it might be extended doesn't help you any. In the Neal case, the plus factor was that he was required to fill... that he was required to take part in a registration, in some type of sexual deviant program before he was allowed to be released. That was something that he was required to do before he was allowed to have his parole date. And he did that. Good. Stigma plus. He got the stigma, and he had to do this other thing. Here, if he'd stayed longer, if he'd sort of breathed, and they kept him in prison longer, he'd have a plus. But he didn't. He kept quiet, and he got out. The plus is the chilling effect. It's him not... Basically, what I understand your argument is that he suffered the stigma. He didn't have to affirmatively go into some kind of program, but he did have to give up his grievance rights that he would have otherwise asserted, but he was afraid to do so because of the threat of extending his parole. Is that what you're saying? That is, Your Honor. Okay. But not getting his grievance only resulted in the... If he had succeeded in his grievance, then he would have gotten rid of the stigma. So the effect of not grieving is that he has the stigma. So all you've got is stigma. Where's the plus? I mean, if you go back to... Well, we argue that the plus was the threat of disciplinary actions that affect his sentence duration. Okay. The level... Mr. Johnson had the right to be heard in a meaningful time and in a meaningful manner before the government... But not necessarily before. Yes, necessarily before. Why couldn't he be heard afterwards? Excuse me? Why couldn't he be heard afterwards? He could have been heard afterwards, but that would not have been a meaningful time and in a meaningful manner. Why is that? It's not because regardless of... When there's a liberty interest involved, regardless of whether you use an informal or formal process or... That's not what matters. What you need is the opportunity to be heard, especially when protected liberty interests are implicated, the hearing should be prior. That's what the Supreme Court said in the Roth case, that when there are liberty interests, the hearing needs to be prior to the deprivation. Here we had liberty interests and no prior hearing. Okay. So in this case, the liberty interest was invasion of his body through the sampling. Is that one of them, to be free of the taking of the sample in the first place? The liberty interest in this case is the right to not have his body intruded upon, like the right to bodily integrity, and he has an interest in not being stigmatized as a sex offender. Okay. Now, the stigmatizing thing could have been cured because it didn't go public until, in fact, apparently it got stopped eventually, even before it did go public. Isn't that correct? So why wouldn't the grievance procedure have been adequate? The grievance procedure may or may not have been adequate. Well, but you're saying that unless you're saying per se, you can never have a post-deprivation hearing if it involved a defiant liberty interest. Is that what you're saying? That if you can call something a liberty interest, it must in all cases be pre-deprivation hearing? That's not what I'm saying. That's what the Supreme Court said in the Roth case. You're saying, with that authority, you're saying? Yes. Okay. So that's what case holds then? Roth, that when a protected liberty interest is implicated, the hearing should be prior. That's at 569 and 570 of the Roth case. Your time. Thank you. Good afternoon, Deputy Attorney General James Flynn, representing the defendant prison officials. Do you think it was appropriate to take his blood and to do everything that they mistakenly did, apparently, since there was no statutory authorization? Forget about the statute. What do you think about that? They call the prisoner in, they say you are convicted of a misdemeanor, and we're going to take your blood. Do you think that squares with constitutional law under the Fourth Amendment? There's no law on that subject, Your Honor, at the moment. The question is whether that would have been reasonable or not. We don't have any law. What we have is a new statute that was in effect at the time, and an error was made by a person. An error could constitute a violation of a person's Fourth Amendment rights. We know there was an error and it was a mistake. And it may well be that, you know, the damages would be minimal, but nonetheless, there's a body of law, Cary v. Piffitt, that says you still have to, you know, as a court, recognize a constitutional wrong, even if they're just nominal damages. Well, it's a question. Tell me about whether you think, way back when, calling a prisoner in and saying, whether it's a mistake or not, we're taking your blood, we're going to require all of this. He says, no, no, no, you can't do that. And they do it anyway. Is that something that can be done under the Fourth Amendment jurisprudence? In this be ---- Yeah. In this particular case, I think it goes to some of the questions that I think Judge Kuczynski was raising, which are, we had a statute that authorized the taking from persons convicted of felony indecent exposure. There's no statutory authorization here. Forget about a statute. There's no statute whatsoever. That doesn't answer the question of whether the State could also have authorized the taking from a misdemeanor offender, as it subsequently did in the 2004 amendments. But there's no State authorization at that time. State law does not decide whether there's a constitutional violation. Tell me, how do you evaluate the Fourth Amendment issue here in the absence of State law? There is no ---- I don't need to know that you need to reach that issue, because I don't think you can find a constitutional harm here for two reasons. One, because the mere fact of taking the blood, a pinprick, so is de minimis. And the real harm, which would have been inclusion in the DNA database and perhaps a hit of some sort, never occurred. He was in the DNA database, but as a result of his grievance, and he did file a grievance five days before he was released from prison, and by the time he got back to prison less than two weeks later ---- So the doctrine is no harm, no constitutional violation, unless there's some evidence of harm. I think so. In this case, Your Honor ---- I didn't hear the end of your answer. Pardon me? I don't think you finished your answer, and I was interested in hearing what ---- And my apologies, because I interrupted you. I'm not sure which answer. You said he had a grievance. He had a grievance. About getting the name in the database. He had a grievance. There's a lot of confusion because he kept mixing up the 290 and 296 at the time were linked. They're not linked anymore. And so I think there's a lot of confusion on his part and the prison officials on that. He did file a grievance on April 13th. He was released on April 18th. He was back in, I think, something like 11 days later. By the time he got back in, the grievance was being processed, and they decided you're not registrable under 290 as we currently are applying California law in Ray King. The sample had already been taken at that point back in January. He had the option of filing his grievance back then, refusing to provide a sample. He could also, as we pointed out, have simply had the disciplinary action take place and raise that as a defense to the disciplinary action. Those are risky things for a prisoner to do, and he didn't do those things. And so he does give the sample, and then he files his grievance. And I keep waiting for you to finish. The grievance was granted. The grievance was granted, and he didn't. So what was the consequence of that? And he never had to go through with the finalized registration, as the district court found, for purposes of 290. He never got in the database? He did get in the DNA database, but as a result of the finding that he shouldn't have been, they expunged the sample and removed it, I think. The ID profile was removed in 2001. The last of the specimens were eliminated, I think, in 2004. Now, you're correct, under the current statute, there's multiple sections under which he would be obligated to register. In fact, I checked this week. In fact, a new sample was provided in December of 2005, and it's at the DNA lab awaiting analysis in preparation of the DNA profile. It comes back to the notion somehow there's no harm, no foul, if you violate the Fourth Amendment. That's a novel concept, but I don't know if there's any authority for that. Well, there's also, if you look at Rise, that was one of the questions in Rise, because one of the two plaintiffs in Rise had a sample taken when he did not have a qualifying offense. In that case, they found that there was no violation because there was no causal connection between the actions of the particular defendants and the taking of the samples. That is also the case here because the evidence is that a records officer instructed a nurse that their interpretation of the statute was that he had to provide a sample, and she took the sample. There isn't any, none of those records officers are defendants. We don't even know who they are. That goes to what, the mere fact that somebody, if you take my DNA and you have no right to do it and it goes in a database and sits there for five years, I'd be very surprised to know that I have no constitutional violation and no claim because the fortuity never got a hit on it. Now, maybe I haven't sued the right person or maybe there's no causal connection or maybe I have no damages, but... But at best, you may be looking at a nominal damage case at best. Yeah, well, those of us who've been sued in our former capacities have some sense of damages and the like. In any event, my question goes to this liberty interest notion. If the prisoner is put in a situation where he has to either protest and refuse the sample and risk some kind of problem with prison authorities or he gives in, is there some kind of liberty interest violation there when he is essentially, that is coming to the stigma plus concept, isn't there some kind of plus if the prisoner is put in a Hobson's Choice situation? I don't think so in this case, Your Honor. It's not like Neil Bishimoto or Vitek on which Neil was based. Those cases all required a compelled, in addition to being identified as a sex offender, a compelled to participate in a treatment program as a condition of parole was what Neil was about. Vitek was a mandatory mental health commitment to a mental health hospital for treatment. I don't think none of this rises to that level. He didn't, as the Court has correctly pointed out, lose any time credits. He wasn't disciplined. He wasn't threatened with criminal action. The assertion that he was chilled in filing a grievance I don't think is borne out by the facts since he, in fact, did file a grievance before he left prison, which was ultimately granted. But if he hadn't done that, in other words, why wouldn't it be enough if a prisoner essentially gives up his procedural due process right to avoid the stigma? Well, he didn't give it up to avoid the stigma, Your Honor. He gave it up because he thought, I believe incorrectly, that if he had done that, he would have risked a disciplinary action which would have extended the time at which he could be released from parole. Now, the reality is when he did file a grievance, it was granted. And had he done that promptly in January when he was told he had to provide the sample, instead of waiting until a few days before he left, that issue may have been resolved well before he had gone. So I just don't think the stigma plus liberty interest analysis really fits the facts of this case. There is some kind of plus when you have to essentially capitulate because of the collateral consequence. I understand. By asserting your right. Sure, and I understand that. But he was provided with procedures by which he could have challenged it before the taking. And certainly he had procedures for correction which occurred after, you know, post deprivation. What would have happened if he had resisted, in fact? I mean, he would have gotten a violation, but that wouldn't have stopped him from drawing the blood. Arguably, they could have forcibly taken the blood. We don't know that they would have necessarily. They might have waited until a resolution of the grievance. We don't know any of that because it never happened. He never presented the grievance. I mean, normally you can't, in prison, you can't say I'm not going to do something and then get away with it. They make you do it. In this case, all Nurse Curran told him was that he would be disciplined. He was disciplined. I didn't say we're going to forcibly take the blood from you. So just to make sure I understand what all the consequences were. So he gets the blood drawn.  I think they, did they take the blood again? No, they didn't. His latest sample, the sample methodology now is buccal swabs of the mouth. So it's even less intrusive than the pinprick. So he never had another sample taken other than that one until 2005 when he had the buccal swab taken. So they draw the blood and he, because he files a grievance granted, he doesn't have to do the registration report. Don't confuse the registration with the sampling. The registration is a separate matter. As a sex, certain sex offenders have to register when they get out. Now, he, shortly before he was going to parole, he was told he had, he was given notice that he would have to register when he got out. That was really what he was most upset about, I think. At the time, at the time, only, under 296, only persons convicted of felony indecent exposure had to register and it was linked. So that those are the people, you would take samples from felony offenders who had to register. The current statute provides for both felony and misdemeanors. So that's how the linkage occurred. So you understand. So 296, there was a violation of the state law, 296, because he did not have to give his sample. Because he did, he would not have had to give his sample in 99. He gave a sample. But he did. He gave a sample and he didn't register for, as a sex offender. The district court found, based on the record, that he never had to complete the registration because the Department of Justice, California Department of Justice, sent back the registration notice and said, this guy is not registrable under the reasoning of N. Ray King, which was being applied at the time. When he got that is when he filed his grievance. So he never actually had to register. What were the other consequences of having them on the blood? He got put in a database? His sample was put in the database and removed, and the ID profile was removed in 2001. There's no indication that this. How much later? The ID profile was removed in May 2001, and the last of the specimens that were at the lab were destroyed in, I believe it was 2004, before the change in the statute. But there's no evidence that the ID profile was disclosed outside the database or the laboratory, that anybody did a hit on it, that he was subject to prosecution as a result of the information. What were the consequences of being put in a database? Is that something that's available out in the world? No, no, no. If somebody finds a hit on the ---- It's available to only law enforcement officials for the purposes of ---- That's national. Pardon me? That's a national hit list, right? In other words, there's an ability to ---- It's a CODIS-Cal DNA database, so it could be national. That's right, Your Honor. You know, and I do want to note that in ---- although the rise did not get to this question, there are special circumstances, I think, in a prison that makes the collection of DNA perhaps even more important in that context. And that is that, as we all know, there are assaults, sexual and otherwise, that occur in prison, where prisoners are often reluctant because of being labeled as a snitch to even disclose that. The availability of the DNA database may, in fact, apart from whether or not it could lead to future criminal prosecution, assist prison officials in identifying assailants who might not otherwise be identified and then taking security measures to deal with that fact. Right now, they have ---- if the person doesn't come forward and identify as attacker, which is common, they don't have any way of identifying them. With the DNA database, it may, in fact, assist them in that regard. Now, admittedly, that's not ---- you know, that has not been set forth as a reason in the Statement of Reasons for the various statutes, but I think it's out there, and I think it's something the courts have not gotten to yet, that this prison context issue and just how far does the Fourth Amendment go? But some embattles have been fought over. There have been battles fought, including in this circuit, over whether being a prisoner is enough to justify ---- Whether there's any Fourth Amendment, right, and just how far does it go. And, you know, obviously, prisoners are subjected to blanket searches of all type. Plaintiffs have pointed out, well, it should draw the line internal. Well, prisoners have internal type searches all the time. I understand, but to suggest that that's the rationale, it's clearly debatable. Right. Unless there are any further questions, Your Honor. Okay, thank you. Thank you. We haven't discussed qualified immunity. Given the uncertainty of the law, arguably, way back when, whether or not the prison officials can subject them to, you know, the blood tests that meet, why does qualified immunity not attach at the very least? Well, this Court has held that qualified immunity is not appropriate, just given ignorance or mistake of the law. And so ---- Given the uncertainty of the law here ---- Well, the law regarding 296 was very clear. I mean, 296 said felony offenses only. In fact, the underlying issue of Fourth Amendment rights and entitlement under these circumstances, is that something that was so clearly established at that time? Well, the Rice case had come out in 1995, and that case had held that this was okay, the taking of DNA under the statute, assuming that the people had committed the predicate offense. Now, the one petitioner there that had not committed it, part of the problem there the Court held was the due process. And they looked at Daniels v. Williams and said it was just probably negligence that was the reason that that was done. And so they didn't really address the question there. But, I mean, the law of the circuit regarding the Fourth Amendment, for sure, in Rice, was this was okay if they committed the predicate offense. That's quite different from saying it's not okay if they didn't. Well, but the Supreme Court has given direction regarding the constitutional protections prisoners have. For example, in Hudson v. Palmer, they held that it's not legitimate for them to expect their cell would not be searched. And so, I mean, the Court recognized that they do have rights. There might be less. And so ---- What you need is something that, for purposes of overcoming qualified immunity, that is so clear that any prison official not trained in the law would know, know he can't do this, it's a Fourth Amendment violation. It's not clear to me even today that it's a Fourth Amendment violation. I'm having a problem figuring out how prison officials in 2000, 1999 here, would have known. I think, I mean, the best evidence we have is the case, the Rice case, that says if they've committed the predicate offense. And I think another would be the manual itself that indicates that felony, or excuse me, misdemeanor, sex offense, indecent exposure is not registrable. Right. Which would tell them that maybe they're committing a violation of state law, and maybe it's a tort, and maybe they'll be subject to discipline. You know, if this gets reported, you know, there'll be consequences from violating state law. But how would they know that they're committing a federal constitutional violation? I mean, reasonably well-trained California state prison officials know that prisoners have constitutional rights, and their actions can impact those constitutional rights. And so part of it goes to looking at what their own procedures are in place, but there's also trainings in the prison and things like that for the employees. So part of it goes to what they know, and they know that there are rights there, and that their actions could implicate those. And so that should give them notice. I mean, the prison is sued frequently by inmates for constitutional violations, so it's not like prison officials don't know that their actions can impact constitutional rights of prisoners. Okay. Thank you. The case is signed and stand submitted. We are adjourned. Thank you. We hope you enjoyed your first day in court. Thank you. David Foster.  David Foster.
judges: Kozinski, Fisher, Block